## ALLIED TOWING CORPORATION, Plaintiff,

v.

## GREAT EASTERN PETROLEUM CORPORATION, Allied Petroleum, Inc., and Petroferm U.S.A., Inc., Defendants,

and

## PUBLICKER INDUSTRIES, INC., Defendant and Third-Party Plaintiff,

v.

## SEALAND LTD. and Philadelphia Gas Works, Third-Party Defendants.

Civ. A. No. 85–808–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

Aug. 21, 1986.

ruling on the issue, the law will become more uniform in this area.

Morton H. Clark, Carter T. Gunn, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for plaintiff.

Daniel R. Warman, Williams, Worrell, Kelly & Greer, Norfolk, Va., for Allied Petroleum, Inc.

Waverley L. Berkley, III, Jett, Agelasto, Berkley, Furr & Price, Norfolk, Va., for Great Eastern Petroleum Corp.

F. Bradford Stillman, McGuire, Woods & Battle, Norfolk, Va., for Petroferm U.S.A., Inc.

Harvey Cohen, Joanne Alper, Cohen, Gettings, Alper & Dunham, Arlington, Va., for Publicker Industries.

William B. Eley, Walter D. Kelley, Jr., Marie L. Achtemeier, Willcox & Savage,

Norfolk, Va., Tyler E. Wren, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for Philadelphia Gas Works.

## OPINION AND ORDER

DOUMAR, District Judge.

In this action, the plaintiff, Allied Towing Corporation, seeks damages and equitable relief from a number of defendants. These defendants have, in response, filed numerous third-party actions and counterclaims against the plaintiff and each other. Additionally, all the defendants, save two, have filed motions to dismiss the initial complaint and/or various derivative complaints. These matters have been exhaustively briefed. In order to simplify the Court's consideration of the issues presented therein, this opinion will begin with a brief recitation of the facts as alleged,[1] and the case's procedural history and then will proceed to consider the motions to dismiss Allied Towing's complaint, and then the motions to dismiss the pending third-party actions.

### I.

#### 1. FACTS

Philadelphia Gas Works (PGW) is a natural gas distribution company owned by the City of Philadelphia and operated by the Philadelphia Facilities Management Corporation. During the 1970's PGW obtained a portion of its gas supply from a manufacturing process that converted fuel oil into gas. PGW on occasion accepted bids for the sale of the oil-based by-product this process produced. In the fall of 1982, a representative of Sealand Ltd. (Sealand) visited PGW's Passyunk facility in Philadelphia to inspect a quantity of this liquid in anticipation of such a bid. In February of 1983, PGW accepted Sealand's ultimate bid of $.01 per gallon for the material. This price was F.O.B. Philadelphia at the Passyunk wharf on the Schuykill River. In June of that year, Sealand arranged for the by-product to be removed from PGW's facility and transported to a tank farm owned by Publicker Industries, Inc. (Publicker).

When Sealand failed to pay for the tank rental, Publicker, apparently exercising its warehouseman's lien, seized the material and attempted to sell it. In April of 1985, Publicker sold 1,000,000 gallons of the material to Great Eastern Petroleum Corp. (Great Eastern) for $1.00. Great Eastern and Petroferm USA, Inc. (Petroferm) subsequently formed a joint venture to resell the by-product. They found a buyer in Allied Petroleum, Inc. (Petroleum) who allegedly believed the liquid to be 60% No. 6 oil and 40% water.[2] To complete the sale, Great Eastern contacted Allied Towing (Towing) to arrange the transport of the No. 6 oil mixture from Publicker's Philadelphia facility to Norfolk, Virginia. Initially, Towing understood that Great Eastern was to pay freight, demurrage and cleanup costs, but subsequent correspondence indicated that Towing was to look to Petroleum for payment. From October 29 through 31 of 1985, approximately 25,000 barrels[3] of the by-product were loaded onto Towing's Barge ATC–3062 in Philadelphia. Towing never suspected that the liquid entering the hold of its barge was anything other than an oil-water mixture.

When the barge arrived in Virginia, Petroleum determined that the liquid was not No. 6 oil and water and rejected the shipment. Towing then contacted PGW, Publicker, Great Eastern, and Petroferm. All

---

1. In ruling on the various motions to dismiss, Allied Towing's allegations must be taken as true, *United States v. Mississippi*, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965), and must be construed in a light most favorable to its cause of action. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

2. Great Eastern and Petroferm each contend that they were without knowledge as to the

material's true nature. They allegedly believed the material to be No. 6 oil and water as well. Resolution of this factual dispute is unnecessary at this time.

3. A barrel of petroleum product is equivalent to 42 U.S. gallons. Webster's Third New International Dictionary 179 (1981).

denied liability and refused to arrange for the product's removal.

Towing also contacted the Environmental Protection Agency (EPA) which, in turn, "deferred" to the Virginia Division of Solid and Hazardous Waste Management. Samples of the substance were analyzed by a variety of laboratories, including the EPA's. While the results of these tests conflict in many key respects, all those who have tested the substance have concluded that its "flashpoint" is extremely low. Towing contends that the flashpoint of individual samples ranged from 74 degrees to 80 degrees F. and that a subsequent test indicated a composite flashpoint of 118 degrees F.

This, Towing contends, makes the material a hazardous waste within the meaning of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901–6987. Barge ATC–3062 is neither equipped nor certified to carry hazardous substances. As a result, both the EPA and the Commonwealth of Virginia have allegedly threatened Towing with substantial civil penalties for operating an unlicensed hazardous waste facility. According to Towing, only three barges of this type exist on the East Coast; the other two are owned by competitors who have now taken Towing's once substantial lighterage business. Additionally, Towing contends it has received no payment for the use of its barge. Petroleum, the company to which Towing first turned for relief, has submitted an affidavit to the Court indicating that it is without funds, even to pay its legal counsel in this matter, and cannot pay for the use of Towing's barge. As a result, Towing now contends that it is potentially liable for civil penalties and for the removal of a substance placed at its doorstep much like a foundling, with no social or adoptive agency ready to assume responsibility for its appropriate disposition. If Towing is correct, the material's continued presence in its barge imminently and substantially endangers the health and the environment of Virginia and its citizens.

2. PROCEDURAL HISTORY

Towing filed its initial complaint in this case on November 25, 1985 against Great Eastern and Petroleum. The complaint invoked the admiralty jurisdiction of this Court and prayed for damages, costs and attorney's fees. On January 2, 1986, Towing amended the complaint to state new claims based on tort and warranty theories and one based on Great Eastern's "failure to properly identify the product as a dangerous and hazardous cargo pursuant to Title 46 of the Code of Federal Regulations." First Amended Complaint at ¶ 2. The amendment also added a prayer for declaratory and injunctive relief. On January 13, 1986, Petroleum filed a third-party complaint against Petroferm.

On January 27, 1986, Towing filed a motion for a preliminary injunction. The matter was heard on February 7, 1986. The Court reserved ruling on the motion and the parties entered into intensive efforts to resolve the most pressing disputes without a judicial decree. Representatives of each litigant then involved, the Virginia Attorney General's Office, the State's Waste Management Office and the Court attempted to reach an agreeable, interim, if not ultimate, resolution to the controversy. This was not possible.

On March 25, Towing filed its second amended complaint, adding Publicker as a defendant. This complaint reasserted the maritime, warranty and tort claims alleged in the first complaint as amended, and articulated for the first time claims expressly based on RCRA and on the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607(a). On April 16, Petroleum's third-party claim against Petroferm was dismissed without prejudice.

On May 15, Publicker filed a motion to dismiss Towing's complaint, a cross-claim against Great Eastern, and third-party claims against Sealand and PGW. Great Eastern filed cross-claims against Petroleum, Petroferm, and Publicker. Petroferm filed cross-claims against Great Eastern and Publicker. Motions to dismiss various

**1344**

claims have been received from a number of parties; to these motions the Court now turns.

## II.

### 1. *Publicker's Motion to Dismiss Towing's Complaint*

#### A. *Count I—RCRA and the defendant's right to notice*

In Count I of its second amended complaint, Towing alleges a cause of action based on the "citizen suit" provisions of the Resources Conservation and Recovery Act, 42 U.S.C. § 6972. Publicker contends that Count I fails to state a claim upon which relief can be granted or, alternatively, that this Court is without subject matter jurisdiction to hear the RCRA claim.

In support of its motion, Publicker draws upon the RCRA "notice" provisions codified at 42 U.S.C. § 6972(b). That subsection provides that:

(1) No action may be commenced under subsection (a)(1)(A) of this section—

(A) prior to 60 days after the plaintiff has given notice of the violation to—

(i) the Administrator;

(ii) the State in which the alleged violation occurs; and

(iii) to any alleged violator of such permit, standard, regulation, condition, requirement, prohibition, or order, except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of subtitle C of this Act [42 USCS §§ 6921 et seq.]; or

(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with such permit, standard, regulation, condition, requirement, prohibition, or order.

In any such action under subsection (a)(1)(A) in a court of the United States, any person may intervene as a matter of right.

(2)(A) No action may be commenced under subsection (a)(1)(B) of this section

prior to ninety days after the plaintiff has given notice of the endangerment to—

(i) the Administrator;

(ii) the State in which the alleged endangerment may occur;

(iii) any person alleged to have contributed or to be contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in subsection (a)(1)(B),

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of subtitle C of this Act [42 USCS §§ 6921 et seq.].

"In this case," claims Publicker, "plaintiff does not, and cannot, allege that it has given the requisite notice, and its Complaint therefore must be dismissed." Publicker's brief in support of its motion to dismiss at 5. Notice, Publicker continues, is a jurisdictional predicate to a citizen suit under RCRA. Publicker claims that this position has been adopted by the Sixth and First Circuit Courts of Appeals. *See Walls v. Waste Resources Corp.*, 761 F.2d 311, 316 (6th Cir.1985); *Garcia v. Cecos International Inc.*, 761 F.2d 76, 78–79 (1st Cir. 1985).

The plaintiff in *Garcia* instituted an action in the Superior Court of Puerto Rico against private and governmental defendants seeking injunctive relief to prevent the construction and operation of a waste disposal facility. The defendants removed the case to federal district court and the plaintiffs amended their complaint to include a claim under RCRA. The district court denied the injunction, and on appeal the First Circuit, *sua sponte*, addressed the jurisdictional issue. *Garcia*, 761 F.2d at 78.

The *Garcia* court, relying on some of its earlier cases, *e.g.*, *Commonwealth of Massachusetts v. United States Veterans Administration*, 541 F.2d 119 (1st Cir.1976), noted that the notice requirement was not a "technical wrinkle," but an important legislatively established device that is "likely

to trigger governmental action which would alleviate the need for judicial relief." *Garcia,* 761 F.2d at 80 (quoting *City of Highland Park v. Train,* 519 F.2d 681, 690 (7th Cir.1975), *cert. denied,* 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976)). Accordingly, the Court held that "[t]he failure to provide *actual* notice to the EPA, the state and the alleged violator at least sixty days before the commencement of the action forecloses the possibility of jurisdiction under RCRA". *Garcia,* 761 F.2d at 83 (emphasis added). Since the parties stipulated that no actual notice had been provided, the Court determined that the case had been improvidently removed.

In *Walls,* the Sixth Circuit also noted the crucial role notice serves in a citizen suit. "The citizen suit notice provisions were intended to give the EPA an opportunity to resolve issues regarding the interpretation of complex standards by negotiation, unhindered by the threat of an impending lawsuit." *Walls,* 761 F.2d at 317. The court found that "actual notice" was a "jurisdictional predicate" to a RCRA action and that the plaintiff's failure to "distinctly and affirmatively plead[ ] the facts forming the basis of subject matter jurisdiction" was fatal to this claim. *Id.*

At least two Circuit Courts of Appeals have expressly held that the notice provisions of 42 U.S.C. § 6972(b) are not jurisdictional. *See Proffitt v. Commissioners of Bristol Township,* 754 F.2d 504 (3d Cir. 1985); *Hempstead County and Nevada County Project v. United States Environmental Protection Agency,* 700 F.2d 459 (8th Cir.1983); *Pymatuning Watershed Citizens for a Hygienic Environment v. Eaton,* 644 F.2d 995 (3d Cir.1981); *see also Fishel v. Westinghouse Electric Corp.,* 617 F.Supp. 1531 (M.D.Pa.1985); *Dedham Water v. Cumberland Farms Dairy, Inc.,* 588 F.Supp. 515 (D.Mass.1983); *O'Leary v. Moyer's Landfill, Inc.,* 523 F.Supp. 642 (D.Pa.1981); *cf. Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation,* 508 F.2d 927 (2d Cir.1974), *vacated on other grounds,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975) (Federal Water Pollution Control Act case). These Courts have adopted a more "pragmatic" approach, finding that "notice-in-fact [is] sufficient to defeat [a defendant's] contention that [the plaintiff's] failure to file sixty-day notices deprived the district court of subject matter jurisdiction over [a RCRA] claim." *Proffitt,* 754 F.2d at 506.

Although the parties to this action apparently read the *Walls* and *Proffitt* cases as polar extremes, *see, e.g.,* Publicker's brief at p. 7 n. 9 (*Proffitt* "wrongly decided" ), the Court finds the reasoning in these cases remarkably similar. *Proffitt* requires "notice-in-fact;" *Walls* and *Garcia* require "actual" notice. "Actual" notice is "notice expressly and actually given and brought home to the party directly." Black's Law Dictionary 957 (5th ed. 1979). Congress' rationale in requiring notice is clear; the E.P.A. must have the opportunity to resolve the dispute "unhindered by the threat of an impending lawsuit." *Walls,* 761 F.2d at 317. On this proposition, all of the reported cases agree. This Court, therefore, must determine what notice, if any, was, in fact, received.

On November 27, 1985, nearly four months before raising its RCRA claim, Towing's counsel dispatched a Telex to PGW, Publicker and the EPA. The full text of the document is set forth in the margin,[4] but its contents may be summarized as follows:

---

4. " Nov 27 1511
Allied Tow NFK

| | | | |
|---|---|---|---|
| TO: | Philadelphia Gas Works | (215–978–3000) (By Telecopy) | ATTN:  Ms. Avant |
| | Publicker Terminal | 131579 | ATTN:  Mr. Tierney |
| | EPA Philadelphia | (By telecopy) (5977906) | ATTN:  Mr. Donovan |
| CC: | Allied Towing Corporation | 7108811238 | ATTN:  Mr. W.E. Law |
| FM: | Vandeventer, Black | 823671 | ATTN:  Mr. Gunn |

(1) We are counsel for Towing and Towing owns Barge ATC–3062

(2) In October this Barge was loaded at Publicker with material we believed to be 60% No. 6 oil and 40% water. It was not. Whatever it is, it has a flashpoint of between 74 degrees and 118 degrees F.

(3) Petroleum has refused the product and we're stuck with it here in Norfolk.

(4) We were advised that this liquid came from PGW and that EPA knew of this substance prior to the loading of the product on our barge. We received no warning from anyone as to its hazardous nature.

(5) We want Publicker or PGW to take this product back and we will hold you liable for all damages and costs involved.

██ Publicker contends that this notice was inadequate in light of the requirements of 40 C.F.R. § 254. Under this regulation, the required notice should "include sufficient information to permit the recipient to identify the specific permit, standard, regulation, condition, requirement or order which has allegedly been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the date or dates of the alleged violation and the full name, address and telephone number of the person giving notice." 40 C.F.R. § 254.3(a). This notice accomplishes this task. It identifies the dangerous flashpoint as at least one of the standards allegedly violated, indicates the role PGW and Publicker played in allegedly failing to warn Towing of the substance's nature, and gives the date of the alleged violation. It clearly indicates Towing's intent to hold both PGW and Publicker liable for its losses. While the standard assertedly violated might have been identified with greater specificity, the regulation merely requires that the notice provide sufficient detail for the *recipient* to identify the violated standard. This Court holds that the notice dispatched by Towing[5] and received by Publicker satisfied the notice requirements of § 6972(b).

RE: Barge ATC 3062—Cargo of Hazardous Substance Loaded at Philadelphia

27 November 1985

1. We are counsel for Allied Towing Corporation of Norfolk, Virginia. Allied Towing is the owner of the Barge ATC–3062.

2. From 29–31 October 1985, ATC–3062 Loaded approximately 25,000 barrels of product at Publicker Terminal, Philadelphia pursuant to the instructions of the charterer of the Barge (Great Eastern Petroleum Corporation). The product was represented to be 40% water, 60% No. 6 oil. Upon arrival of the Barge at Norfolk, samples were analyzed and we are advised flashpoint ranged between 74 degrees and 80 degrees F. (Subsequent testing indicated a composite flashpoint of 118 Degrees F.)

3. As a result of dispute between charterer of Barge and buyer of product (Allied Petroleum Corporation) as to its specifications, product remains aboard ATC–3062 with neither charterer nor buyer accepting responsibility for disposal.

4. We are advised that source of product was Philadelphia Gas Works and that EPA Philadelphia was informed as to specifications of substance and its loading aboard Barge ATC–3062 at Publiker Terminal. Allied Towing received no warning as to the hazardous nature of the product.

5. As disposal at Norfolk impracticable, Allied Towing requests authorization to discharge hazardous substance aboard ATC–3062 at Publiker Terminal or Philadelphia Gas Works. Allied Towing will hold Philadelphia Gas Works and Publiker Terminal responsible for all damages and costs incurred in the disposal of the hazardous substance loaded aboard the ATC–3062 at Philadelphia.

Vandeventer, Black
Gunn
HUGHSVAN NFK"

5. The notice was sent by Telex. The regulation cited by Publicker requires notice by registered

Publicker claims, however, that because notice is jurisdictional, the plaintiff must affirmatively *plead* notice, i.e., that the source of the Court's jurisdiction must appear on the face of the plaintiff's complaint.

The plaintiff's complaint indicates that the Court's jurisdiction is based, in part, on RCRA, that following the barge's arrival in Norfolk, "[n]o instructions were given ... by the defendants as to the disposition of the cargo," Second Amended Complaint at ¶ 15, that the "defendants have refused to remove or dispose of the cargo...." *Id.* at ¶ 16, and that "[a]lthough demand has been made upon the defendants for directions ... no such directions have been forthcoming." *Id.* at ¶ 20.

■ The Court starts from the proposition that pleadings are to be construed so as to do substantial justice, Fed. R. Civ. P. 8(f), and when ruling on a Fed. R. Civ. P. 12(b) motion, in a light most favorable to the plaintiff, *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A court most assuredly may not manufacture subject matter jurisdiction, but where the facts necessary to its jurisdiction are alleged, the recitation of some special incantation is unnecessary. *See generally* Wright, Law of Federal Courts § 69 (3d ed. 1976). The allegation that the defendants refused to allow Towing to return the product carries with it, by necessity, the unspoken assertion that the plaintiff asked them to take it. Any other reading of the facts actually alleged in the complaint is untenable. Even if the Court were to assume that notice is jurisdictional, granting Publicker's motion to dismiss on this ground would be to sacrifice substance on the altar of form. This the Court will not do.

■ Similarly, Publicker's assertion that this Court is deprived of its jurisdiction because the notice was addressed to the wrong individual, see 40 C.F.R. § 254.2, is without merit.[6] As noted *supra,* actual notice is all that is required. Because the "defendants have not been prejudiced by this [alleged defect and since actual notice was received] ... this Court will not refuse to proceed with this matter on that basis." *South Carolina Wildlife Federation v. Alexander,* 457 F.Supp. 118, 124 (D.S.C.1978) (F.W.P.C.A. case).

■ Finally, Publicker seeks to have the first count dismissed because Towing "may not collect a money judgment against [the defendants] for violations of RCRA." Apparently, Publicker reads Count I as a prayer only for legal, not equitable, relief. Indeed, the language of paragraph 11 of Count I only mentions the request for damages. At the conclusion of all the counts, however, the complaint prays for "such declaratory and injunctive relief as is necessary to bring about the proper removal, storage and/or disposal of the waste on Barge ATC–3062." Prayer for relief ¶ 2 at 6. While this specific language is not contained in Count I as such, the complaint must be read as a whole. A complaint cannot be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). This cannot be said of Count I of Towing's complaint when properly construed.

### B. *Count II—Proper parties defendant to a CERCLA Claim*

In Count II of its second amended complaint, Towing contends that all of the de-

---

mail. 40 C.F.R. § 254.2(1). As noted, *supra,* the cases require only actual notice. To dismiss Towing's claim because the method used to deliver the message varied from that prescribed by the regulation would be the ultimate folly. Because Publicker has not, and cannot, claim any real prejudice because of the *method* of service, the Court finds Publicker's complaint in this regard without merit. *See South Carolina Wildlife Federation v. Alexander,* 457 F.Supp. 118 (D.S.C.1978) (F.W.P.C.A. case).

**6.** According to 40 C.F.R. § 254.2(a)(1), notice should have been sent to "the owner or site manager of the building, plant, installation or facility alleged to be in violation." The identity of Publicker's "owner or site manager" is not revealed in the submissions before the Court. The notice was actually sent to a Mr. Tierney at Publicker.

fendants collectively have caused "an imminent and substantial endangerment to health and environment in the Commonwealth of Virginia." Second amended complaint, at ¶ 21. Towing pursues a private right of action under CERCLA to recover the "costs" it has incurred.

In response, Publicker contends: (1) that Towing has incurred no recoverable costs, (2) that the "cleanup" Towing seeks is not consistent with the National Contingency Plan (NCP) and (3) that Publicker is not a "person" subject to suit within the meaning of CERCLA.

CERCLA was passed in 1980 to provide the nation with a comprehensive and workable solution to the growing problem of hazardous waste. Federal and state governmental authorities are each given responsibilities under the plan, as are private citizens. The Act requires the EPA to develop and periodically revise a National Contingency Plan (NCP) which includes a National Priorities List (NPL), listing the nation's hazardous waste dumps in order of priority. The Act also established the Hazardous Substance Response Trust Fund, generally known as "Superfund," to finance governmental cleanups of the sites listed on the NPL.

Section 107(a)(1)–(4) of the Act, codified at 42 U.S.C. § 9607(a)(1)–(4),[7] makes certain private entities liable for what are called "response" costs. Towing has invoked these provisions in this case. Publicker, however, contends that costs incurred in storing, testing, and attempting to dispose of the cargo are not "necessary costs of response." 42 U.S.C. § 9607(a)(4)(B). " 'Respond' or 'response' means remove, removal, remedy and remedial action" 42 U.S.C. § 9601(25). "Removal," in turn, is defined by § 9601(23) as the cleanup or removal of hazardous substances from the environment and "such actions as may be necessary to monitor, assess and evaluate the release of hazardous substances, the disposal of removed material or the taking of such other actions as may be necessary to prevent, minimize or mitigate damage to the public health or welfare or to the environment...." "Remedial" actions are those "consistent with permanent remedy taken ... to prevent or minimize the release of hazardous substances so that they do not migrate to cause [a] substantial danger." 42 U.S.C. § 9601(24).

In this case, Towing alleges "economic and consequential damage to its business, costs of storing, testing and attempting to dispose of the cargo, legal costs associated with these efforts plus future costs of removing and disposing of the cargo." Second Amended Complaint at ¶ 19. Clearly, CERCLA does not provide a remedy for the plaintiff to recoup his business losses. The question is whether CERCLA would allow Towing to recover its alleged costs in "storing, testing and attempting to dispose of the cargo."

---

**7.** This section provides in part that:

(a) Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility,

(2) any person who at the time of disposal of any hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

This Court is persuaded by the language of the statute that Towing's complaint states a claim for cost recovery under CERCLA. The plain language of § 9601 brings within the scope of a § 9607 action those expenditures "necessary to monitor, assess and evaluate" what is required to protect the public health and actions taken "consistent with [a] permanent remedy" to prevent catastrophes. It would be sheer folly to move or dispose of this substance without careful analysis and inconsistent with CERCLA's purpose to require an innocent plaintiff to bear the necessary costs. Moreover, it is difficult to discern how attempts to find a permanent remedy are not, as a matter of law, actions taken "consistent with a permanent remedy." *Accord Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d 887 (9th Cir.1986).

This, of course, does not mean that Towing has incurred "necessary costs of response", only that the allegations in its complaint survive Publicker's motion to dismiss as to this issue at this time. The nature of any costs Towing may have incurred is a factual matter to be resolved at trial.

Next, Publicker seeks to have Towing's CERCLA claim dismissed because the response costs Towing allegedly incurred were not "consistent with the NCP." Publicker's brief at 16. Specifically, Publicker contends that Towing cannot recover because its actions were not taken at the direction of the federal government, or following government approval. Further, Publicker contends that Towing's claim is not cognizable under CERCLA because its barge has not been listed by the EPA on the National Priorities List.

At least one court has held that a private litigant suing under § 9607 must first obtain governmental approval before commencing remedial actions. *See, e.g., Bulk Distribution Centers, Inc. v. Monsanto,* 589 F.Supp. 1437 (S.D.Fla.1984). The EPA administrator, however, disagrees. According to the administrator, it should be "absolutely clear that no Federal approval of any kind is a prerequisite to a cost recovery [action] under section (9607)." 50 Fed.Reg. 47,934 (1985). As the Honorable Judge Wallace of the Ninth Circuit noted in *Wickland,* "this reading [is] consistent with CERCLA's broad remedial purpose [and] promotes the effectiveness of private enforcement actions under (§ 9607) as a remedy independent of government actions financed by Superfund." *Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d 887, 892 (9th Cir.1986).

Neither is this Court convinced that CERCLA requires an NPL listing as a precondition to the recovery of costs. Such a requirement would certainly render the citizen's suit provision less effective, would be inconsistent with the Act's reliance on "private attorneys general," *cf. Chesapeake Bay Foundation v. Gwaltney of Smithfield,* 791 F.2d 304, 311–12 (4th Cir.1986) and would conflict with the EPA's construction of § 9607. *Accord New York v. General Electric Co.,* 592 F.Supp. 291 (N.D.N.Y.1984).

Finally, Publicker seeks to dismiss Count II of Towing's complaint because it is not a "person" within the meaning of the Act. Section 9607 delineates four classes of "persons" from whom costs may be recovered. They are:

(1) the owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, *from which*

*there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance....*

42 U.S.C. § 9607(a) (emphasis added).

■ Although the underscored language above appears, at first blush, to apply only to those persons covered by subsection (a)(4), a reading of the full text of the section clearly indicates that it was equally intended to modify subsections (a)(1)–(3). *See New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 (2d Cir.1985).

Publicker owns a facility, but it doesn't appear from the complaint that there is a current threat of release of any toxic substance from that facility which may have caused Towing economic damage.

Neither could Publicker be liable under subsection (2). "Disposal" is defined as the "discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or on any land or water so that such ... waste ... may enter the environment...." 42 U.S.C. § 6903(3) (incorporated into CERCLA by 42 U.S.C. § 9601(29)). If Towing's allegations are true, this material was "injected" into its barge, not the land or water. Accordingly, this provision is irrelevant to this case.

The analysis under subsection (3) is more difficult. Clearly, Publicker cannot escape liability by "contracting away" its responsibilities. *See* S.Rep. No. 96–848, 96th Cong., 2d Sess. 31 (1980), *quoted in New York v. General Electric Co.*, 592 F.Supp. 291, 297 (N.D.N.Y.1984), *see also United States v. A & F Materials Co.*, 582 F.Supp. 842 (S.D.Ill.1984). However, this Court finds persuasive the analysis used in *A & F Materials*. Construing the "otherwise arranged" language of subsection (3), the Court determined that "the relevant inquiry is *who decided* to place the waste into the hands of a particular facility that (now) contains the hazardous waste." *Id.* at 845 (emphasis in original). In this case Towing alleges that Great Eastern, and by implication perhaps Petroferm, determined where to place the substance. According-

ly, this subsection does not further Towing's CERCLA claim against Publicker.

The final subsection is applicable only to those who transport hazardous substances. Publicker clearly is not liable under this provision.

■ Under the facts as pleaded, Publicker is not a "person" liable under any of the four subsections found at 42 U.S.C. § 9607(a). For this reason, Count II of the plaintiff's second amended complaint, which seeks cost recovery under CERCLA, is DISMISSED as to Publicker Industries, Inc.

### C. *Counts III and IV—CERCLA, RCRA, and Presumption*

Count III of the plaintiff's complaint is based on principles of "general maritime law," and raises warranty claims. Count IV alleges a cause of action based on negligence and strict liability.

■ Publicker contends that the extensive legislative and regulatory framework surrounding RCRA and CERCLA "occupy the field." Relying in large part on *Middlesex City Sewerage Authority v. National Sea Clammers*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) and *Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (Milwaukee II), Publicker contends that federal and state causes of action for damages arising from the disposition of hazardous substances are preempted by RCRA and CERCLA. Because the expressed Congressional intent is to the contrary, this Court disagrees.

Section 6972(f) of RCRA provides in pertinent part that:

Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or requirement relating to the management of solid waste or hazardous waste, or to seek any other relief....

CERCLA has its own "savings" statute, found at 42 U.S.C. § 9614(a):

Nothing in this Act shall be construed or interpreted as pre-empting any state from imposing any additional liability or requirements with respect to the release of hazardous substances within such state.

The plain language of these statutory provisions indicates a Congressional intent to leave untrammeled the right of an individual to invoke principles of statutory or common law in damage actions pendant to CERCLA or RCRA claims. Publicker points out, however, that in *Sea Clammers* and in *Milwaukee II*, the U.S. Supreme Court interpreted virtually identical language and concluded that the Federal Water Pollution Control Act (FWPCA) and Marine Protection, Research, and Sanctuaries Act of 1972 (MPRSA) preempt the federal common law of nuisance and claims under 42 U.S.C. § 1983. Further, Publicker notes that the First Circuit, in *Conner v. Aerovox*, 730 F.2d 835 (1st Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1747, 84 L.Ed.2d 812 (1985), has held that all such maritime claims have been preempted, and that the Seventh Circuit has held that all state tort law in this area has been preempted by the federal pollution acts, *Illinois v. Milwaukee*, 731 F.2d 403 (7th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 979, 83 L.Ed.2d 981 (1985) (Milwaukee III). One court presented with this same question found Milwaukee III to be wrongly decided, *Ouellette v. International Paper Co.*, 602 F.Supp. 264, *aff'd*, 776 F.2d 55 (2d Cir.1985) and the Supreme Court has granted certiorari to resolve this split among the Circuits, —— U.S. ——, 106 S.Ct. 1457, 89 L.Ed.2d 715 (1986).

In the House Report on the Hazardous and Solid Waste Amendments of 1984, the Committee on Energy and Commerce noted that "[a]lthough [we have] not prohibited a citizen from raising claims under state law in a (§ 6972 RCRA) action, [we] expect courts to exercise their discretion concerning pendant jurisdiction in a way that will not frustrate or delay the primary goal of this provision, namely the prompt abatement of imminent and substantial endangerments." H.R.Rep. No. 98–198, 98th Cong., 2d Sess. 53, *reprinted in* 1984 U.S. Code Cong. & Ad. News 5576, 5612. In addressing RCRA's savings clause, the Committee noted that § 6972(f) "of RCRA was intended to preserve the rights of litigants under any statute of [sic] common law, notwithstanding the passage of RCRA." *Id.* at 49, *reprinted* at 5608. The Committee continued, quoting from the original Committee report accompanying RCRA: "Since the passage of RCRA, the Supreme Court *overlooked* language virtually identical to (§ 6972(f)) in ... the Clean Water Act and held that Congress did not intend to preserve the federal common law after passage of the Clean Water Act." *Id.* (citing *Milwaukee II*) (emphasis added).

The Court also finds instructive the following excerpt from the minority report the 1984 Amendments:

> Our second objection to the (Amendments) arises from the Committee's refusal to adopt a clarifying amendment to Section 12(f), the citizen suit provision. That amendment stated that no district court before which an imminent and substantial endangerment action is brought is empowered to hear related state law claims. That amendment simply clarified what we had understood to be the intention of the citizen suit provision and that is to give citizens a federal cause of action to abate imminent and substantial endangerments created by hazardous waste disposal facilities.

> Unfortunately, we believe the citizen suit provision goes much further than was intended because, under a legal doctrine called pendant jurisdiction, citizens will have the opportunity to try to bring all related state claims they may have into the federal court system when they sue to abate imminent hazards. In our opinion, this is an extremely troubling result for a number of reasons. First, there would be a potentially crushing new burden on the federal court system. This court system is a fraction of the size of the state court system and is not equipped to resolve complicated state law questions. Federal court judges would

at times have to turn to state courts for guidance during the course of the suit. This could slow down the proceeding which, as we understand it, is intended to be an emergency type action to abate imminent hazards. Instead of ending the imminent hazard, federal judges will be trying to decide cumbersome questions of state law nuisance, trespass, and personal and property damage compensation.

We believe these types of state law claims should continue to be within the exclusive province of the state courts which have the background and experience necessary for proper decision-making. It is in state courts that citizens will get the most expeditious and well-founded decision for their state claims. Unfortunately, however, the full Committee refused to adopt the amendment which would have clarified this result.

*Id.*

Whatever this may portend for the vitality of *Milwaukee II* and *Sea Clammers* as those cases pertain to the Clean Water and FWPC Acts, this Court cannot simply ignore Congress' clearly expressed intent as it pertains to RCRA. Both the majority and minority reports read the language of § 6972(f) as confirming the right of an individual to bring other claims pendent to his RCRA claim, subject, of course, to the Court's discretion. Further, nothing in the legislative history of CERCLA or in the pertinent case law requires this Court to dismiss Towing's damage claims in Counts III and IV.

### D. *Summary*

Publicker's motion to dismiss Towing's complaint for lack of subject matter jurisdiction and for failure to state a claim are DENIED, in all respects except the second count. Because Publicker Industries, Inc. is not a "person" subject to CERCLA liability under any view of the facts alleged in the amended complaint, this second count is DISMISSED as to that defendant.

### 2. *Petroferm's Motion to Dismiss Towing's Complaint*

Petroferm's brief in support of its motion to dismiss closely follows Publicker's in form and substance. For the reasons stated *supra*, the Court finds Petroferm's duplicative arguments no more persuasive. One unique issue is raised, however, in Petroferm's brief. Petroferm contends that "Count I fails to contain even a single description of conduct by Petroferm which allegedly violated any aspect of RCRA or its accompanying regulations." Petroferm's brief in support at 3. Indeed, while the complaint is replete with allegations concerning the conduct of Great Eastern and others, the only mention of Petroferm comes in ¶ 7 where Towing alleges that Petroferm is "organized and existing . . . in a state other than Virginia" and has its principal place of business in Delaware.

During the hearings before the Court on this matter, Towing has consistently contended that Petroferm was Great Eastern's joint venturer. Petroferm has not seriously contested this assertion. Since all joint venturers share "responsibility . . . for liability incurred within the scope of the enterprise," *Rowe v. Brooks*, 329 F.2d 35, 39 (4th Cir.1964), the allegations concerning Great Eastern might well have been sufficient to defeat Petroferm's motion to dismiss, had Towing alleged the joint venture relationship in its complaint. As it stands, however, Towing's complaint fails to state a cause of action against Petroferm as to any of the counts. Accordingly, the complaint must be DISMISSED as to Petroferm.

"In dismissing a complaint for failure to state a claim . . . the court should heed the admonition of Rule 15 and allow amendment 'freely' if it appears at all possible that the plaintiff can correct the defect." 3 Moore's Federal Practice ¶ 15.10 (2d ed. 1985). Since Towing has asserted the joint venture relationship informally in these proceedings, Petroferm cannot be prejudiced by allowing Towing to amend its pleadings to conform to this position and be allowed to prove the issue at trial. In light

of the strong preference embodied in the Federal Rules for the resolution of controversies on the merits, *see, e.g., U.S. v. E.B. Hougham*, 364 U.S. 310, 317, 81 S.Ct. 13, 18, 5 L.Ed.2d 8 (1960), and the absence of prejudice to Petroferm, this Court GRANTS Towing ten (10) days to amend its complaint to reflect the basis for Petroferm's alleged liability in this regard. Given the disposition of Towing's claim against Petroferm, the Court has no occasion to consider at length the other issues raised in the latter's motion to dismiss at this time.

### III.

*PGW's Motions to Dismiss Publicker's Third Party Complaint*

PGW contends that Publicker's third-party complaint must be dismissed because this Court does not have *in personam* jurisdiction to hear the claim, because process was not validly served and because the complaint fails to state a claim.

PGW contends that it is not amenable to suit in Virginia, either because its alleged activities do not bring it within the ambit of the Virginia Long-Arm statute, Va. Code Ann. § 8.01–328.1 (1984 Repl.Vol.), or because the due process guarantees of the United States Constitution require dismissal.

■ The valid exercise of *in personam* jurisdiction by a federal district court over a nonresident defendant depends upon the proper service of process on the defendant and upon the defendant's amenability to suit in the forum state. *Terry v. Raymond International, Inc.*, 658 F.2d 398, 401 (5th Cir.1981), *cert. denied*, 456 U.S. 928, 102 S.Ct. 1975, 72 L.Ed.2d 443 (1982).

#### A. *Service of Process*

■ Service of process is the "physical means by which jurisdiction is asserted." *Id.* The pertinent federal rule, Fed.R.Civ.P. 4(e), authorizes a federal court to deliver a summons and complaint in any manner authorized by either federal law or by the law of the state in which it sits. Absent a federal statute expressly autho-

rizing nationwide service of process, the validity of service on a nonresident defendant is controlled by the law of the forum state. *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 295 (3d Cir.), *cert. denied*, — U.S. ——, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985).

Publicker argues that both CERCLA and RCRA impliedly authorize nationwide service of process. PGW vigorously disagrees. Both parties cite with approval the case of *Violet v. Picillo*, 613 F.Supp. 1563 (D.R.I.1985). Publicker urges this Court to adopt *Violet's* reasoning (nationwide service comports with CERCLA's purpose). PGW urges its holding (Congress did not authorize such service).

■ This Court need not reach this issue. The validity of the actual service of the complaint pursuant to Fed.R.Civ.P. 4(e) may also be determined by reference to state law. In this instance, the Court need go no further than Va. Code Ann. § 8.01–288 (1984 Repl.Vol.), which provides, in pertinent part, that "process which has reached the person to whom it is directed within the time prescribed by law, if any, shall be sufficient although not served or accepted as provided in this chapter." Since PGW does not dispute that it actually received the process in a timely manner, there is no defect as to the physical service of process.

#### B. *PGW's Amenability to Suit*

The amenability of a defendant to suit in a particular forum is determined by the "substantive reach of the forum's jurisdiction." *Terry*, 658 F.2d at 401. The reach of the forum's jurisdiction may be limited by the provisions of the state long-arm statute, as well as by the due process constraints of the Constitution.

#### (1) *Applicability of Virginia long-arm statute*

In diversity cases, the Fourth Circuit applies a twopart test to determine questions of personal jurisdiction: "First, whether there is statutory authority for the exercise

of jurisdiction ... and second, whether the exercise of jurisdiction complies with federal constitutional standards of due process." *Wolf v. Richmond County Hosp. Authority,* 745 F.2d 904, 909 (4th Cir.1984), *cert. denied,* — U.S. ——, 106 S.Ct. 83, 88 L.Ed.2d 68 (1985) (emphasis added, citation omitted).

While state long-arm statutes are central to the first inquiry in a diversity case, "[i]n a case brought under ... federal case jurisdiction, the defendant's *amenability* to process under state law, which would be critical in a pure diversity based action, is irrelevant." *Terry,* 658 F.2d at 402 (emphasis added). In an action within the original jurisdiction of the federal court, brought to enforce a federally-created right, the defendant's amenability to suit should be measured by the constraints of the *International Shoe* doctrine and not by the jurisdictional limitations imposed by a state legislature on its own courts. Where only federal rights are involved in a case, it would seem unnecessary to look to the jurisdictional limitations applicable to a state court adjudicating state law claims to determine whether a federal court may hear a federal claim.

This analysis has found considerable favor among commentators, *see, e.g.,* A. von Mehren & D. Troutman, *Jurisdiction to Adjudicate: A Suggested Analysis,* 79 Harv.L.Rev. 1121 (1966); 4 Wright & Miller, Federal Practice and Procedure: Civil §§ 1075, 1127 (1969). It has been adopted by the Fifth Circuit, *see, e.g., Lapeyrouse v. Texaco, Inc.,* 693 F.2d 581 (5th Cir.1982) and by courts in other circuits, *see, e.g., Ideal Stencil Machine & Tape Co. v. Merchiori,* 600 F.Supp. 185 (S.D.Ill.1985); *Vest v. Waring,* 565 F.Supp. 674 (N.D.Ga.1983).

In the present action, the Court's jurisdiction to hear the plaintiff's complaint, and by extension, Publicker's third-party complaint, rests on the presence of a federal question, and/or upon the admiralty jurisdiction of the federal courts.

Accordingly, this Court finds it unnecessary to consider PGW's contacts with Virginia in the context of the state long-arm statute, and will proceed directly to determine whether it is constitutionally permissible to require PGW to defend this suit in the Virginia federal court.

### (2) *Due process inquiry*

A valid judgment may be rendered against a foreign defendant only if that defendant has such "minimum contacts" with the forum state as to make it fair and equitable to require the defendant to try the action there. *International Shoe v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). "The concept of minimum contacts, in turn, can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States through their courts do not reach out beyond the limits imposed on them by their status as co-equal sovereigns in a federal system."[8] *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291–92, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980).

The "minimum contacts" analysis of *International Shoe* is based on "traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158. Determining what constitutes fair play and substantial justice requires a delicate balancing of the interests of all those involved in each case. While the burden that inconvenient litigation places on the defendant is always a primary concern, *World-Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. at 564, the Court must also consider "the forum State's interest in adjudicating the dispute, ... the plaintiff's interest in obtaining convenient and effective relief ... the interstate judi-

**8.** The Supreme Court's subsequent opinion in *Insurance Corp. of Ireland v. Compagnie es Bauxites,* 456 U.S. 694, 703 n. 10, 102 S.Ct. 2099, 2104 n. 10, 72 L.Ed.2d 492 (1982) draws into question the continued validity of this second "sovereignty" function. Because this case arises in federal court, this second function would obviously play no role in the Court's determination on this issue. Its continued validity is, therefore, irrelevant.

cial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies." *Id.* (citations omitted).

### (a) *Desirability of a Unified Proceeding*

No party to this litigation seriously disputes the very real interest this Court has in resolving this dispute quickly and completely. If the plaintiff's contentions are, in fact, true, a very large vessel filled with an extremely hazardous substance sits in one of the busiest harbors in the world, jeopardizing the health and safety of a significant portion of the more than one million people who reside in the Hampton Roads area. The more protracted this litigation becomes, the greater the potential for a mishap. This alleged danger, if true, facing innocent citizens cannot be permitted to continue in face of a statutory remedy designed to obviate the same.

It cannot reasonably be disputed that Towing, and by extension Publicker, deserves the most convenient and timely relief constitutionally permissible. Towing contends that its barge, allegedly unique in its construction and suitability for particular jobs, has been tied to a Norfolk dock since November of 1985 because no one will receive the product. Towing further alleges that it has not been paid even a token sum for the use of the barge, and that it has lost its market position because the barge has been out of service.

Clearly, a single judicial proceeding in Virginia which brings all the parties into one forum for a single action on the merits would be more efficient than piecemeal litigation of various claims, cross-claims, and third-party claims up and down the Eastern Seaboard. In addition, a unified proceeding is most likely to further the substantive social policies underlying the environmental acts that Congress sought to advance by including expansive citizen suit provisions in those acts. *See* discussion, *supra,* 1343–53.

### (b) *PGW's Contacts with Virginia*

Against these weighty considerations, this Court must balance PGW's interest in avoiding litigation in Virginia.

Jurisdiction under the minimum contacts test exists when the defendant's relationship to the forum and to the litigation "are such that he should reasonably anticipate being haled into court" in that foreign jurisdiction. *World-Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567. What, then, should PGW, a generator of volatile, hazardous substances, reasonably foresee in terms of its amenability to suit in a foreign jurisdiction?

PGW is a public utility owned by the City of Philadelphia and operated by the Philadelphia Facilities Management Corporation. Page 1342, *supra.* It provides natural gas solely to customers within the confines of Philadelphia's city limits. According to Thomas F. Bonner, Senior Vice President of PGW, "[a]t present, and for at least six years, PGW has neither directly or through any other entity done business ... in the Commonwealth of Virginia." Bonner Affidavit at 2. Indeed, it appears that PGW's sole contact with Virginia was the series of events by which the coal-gasification by-product at issue in this litigation made its way to Virginia. See pages 1342–43, *supra.* The minimum contacts analysis mandated by the due process clause is not merely a quantitative inquiry, however. In determining whether the defendant's contacts with the forum are such that the defendant should reasonably anticipate being haled into the courts of that forum, the courts consider the nature or quality of the contacts as well as their number. *See, e.g., Velandra v. Regie Nationale des Usines Renault,* 336 F.2d 292, 298 (6th Cir.1964); *Securities and Exchange Commission v. Myers,* 285 F.Supp. 743, 749 (D.Md.1968) ("The analysis of the court in *International Shoe* was directed toward the totality of circumstances in the particular case, which included an assessment, not only of the quantity of the contacts between the de-

fendant and the forum, but also the quality of the nexus.").

When the nonresident defendant places an inherently dangerous substance, such as the hazardous waste at issue here, into the stream of commerce, there is a substantial likelihood that the defendant will be called upon to defend in the state whose citizens have been injured or endangered by that instrumentality. Thus, "the nature of the product may well have a bearing upon the issue of minimum contact, with a lesser volume of inherently dangerous products constituting a more significant contact with the state than would a larger volume of products offering little or no hazard to the inhabitants of the state." *Velandra*, 336 F.2d at 298. *Accord Lichina v. Futura, Inc.*, 260 F.Supp. 252, 257 (D.Colo.1966) ("Because the safety of the public is at stake, the sale of a dangerous product is regarded as a more substantial contact than the sale of a harmless one."). *See also Chattanooga Corp. v. Klingler*, 528 F.Supp. 372, 378 (E.D.Tenn.1981) (court noted that "contacts might also be minimized if the claim involves the placing of a dangerous instrumentality in the stream of commerce") (citation omitted), *reversed on other grounds*, 704 F.2d 903 (6th Cir.1983).

Before PGW sold this substance, Sealand informed PGW that Sealand intended to use the by-product to make roofing materials. PGW sold one million gallons of this substance to an out-of-state concern with the knowledge and expectation that it would be further distributed in the stream of interstate commerce. "The forum state does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." *World-Wide Volkswagen*, 444 U.S. at 297–98, 100 S.Ct. at 567. It is immaterial that PGW itself did not sell the substance to a Virginia purchaser or deliver it to Virginia. It is sufficient that PGW placed the substance into the stream of commerce, enabling the waste to pose a threat to the citizens of any state in which it might come to rest. As Justice Brennan recognized, the placement of an article, particularly a hazardous one, in the stream of interstate commerce, makes it foreseeable that one will be called upon to defend in the courts of a state with which one would otherwise have had no direct contact:

> "[In] *Ohio v. Wyandotte Chemicals Corp.*, 401 U.S. 493 [91 S.Ct. 1005, 28 L.Ed.2d 256] (1971) ... we indicated, in the course of denying leave to file an original-jurisdiction case, that corporations having no direct contact with Ohio could constitutionally be brought to trial in Ohio because they dumped pollutants into streams outside Ohio's limits which ultimately, through the action of the water, reached Lake Erie and affected Ohio. No corporate acts, only their consequences, occurred in Ohio. The stream of commerce is just as natural a force as a stream of water ..."

*World-Wide Volkswagen*, 444 U.S. at 306, 100 S.Ct. at 584, (Brennan, J., dissenting).

Having placed the substance in the stream of commerce, by selling it to an out-of-state manufacturer, PGW took no affirmative step to structure its conduct so as to limit its exposure to suit in foreign jurisdictions. *World-Wide Volkswagen, supra*. This might have been accomplished, for example, by restricting Sealand's use of the product or by specifying in the sales contract a limited geographic market for Sealand's final product. *Violet v. Picillo*, 613 F.Supp. at 1576–77. PGW's failure to exercise any control over the destination of the substance at issue made it possible for that substance to come to rest in any state. *Id.* at 1577.

PGW contends that this "expectation" is not enough, and cites as support *World-Wide Volkswagen* and *Chung v. Nana Development Corp.*, 783 F.2d 1124 (4th Cir. 1986) (sale of reindeer antlers). Neither case, however, involved an inherently dangerous instrumentality. When an inherently dangerous instrumentality is released in commerce, and that instrument causes tortious injury in a foreign forum, the thresh-

old for establishing jurisdiction is less demanding.[9] *See, e.g., Poyner v. Erma Werke GMBH,* 618 F.2d 1186 (6th Cir.1980), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980) (handgun manufacturer); *Violet v. Picillo,* 613 F.Supp. at 1577. Similarly, the scope of "foreseeability" broadens when the enterprise giving rise to the action is subject to pervasive federal regulation. *See, e.g., GRM v. Equine Investment and Management Group,* 596 F.Supp. 307 (S.D. Texas 1984) (securities regulations); *Violet v. Picillo,* 613 F.Supp. at 1578. *Cf. Marshall v. Barlow's, Inc.,* 436 U.S. 307, 321, 98 S.Ct. 1816, 1824, 56 L.Ed.2d 305 (1978) ("when an entrepreneur embarks upon ... [certain types of] business [activities], he has voluntarily chosen to subject himself to a full arsenal of governmental regulation." *Id.* at 313, 98 S.Ct. at 1821. "[B]usinessmen," the Court said, "engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade.... The businessman in a regulated industry in effect consents to the restrictions placed upon him." *Id.* (quoting *Almeida-Sanchez v. United States,* 413 U.S. 266, 271, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596 (1973)).

Against this reduced standard, the Court must measure the actual burden foreign litigation would impose on PGW. The geographic distance separating the defendant in Philadelphia and the Virginia forum is not great. In this case, the Court cannot say that PGW will " 'harshly feel' the 'distances involved, [or] the time required for employees to be away from the office.' " *GRM,* 596 F.Supp. at 315. As in *GRM,* this Court notes that "if some of defendant's employees must eventually come to [Norfolk] for trial, the time they will be taken away from the office depends [more] upon the length of their testimony than upon this court's distant location." *Id.*

Given the very weighty considerations militating in favor of a single proceeding in this Court, particularly the alleged hazard

facing the residents of this area, and the minimal burden imposed on PGW by requiring it to defend its liability here, the Court finds it both fair and reasonable to subject PGW to the *in personam* jurisdiction of this Court. For this reason, PGW's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) is DENIED.

IT IS SO ORDERED.

---

**9.** The parties agree that Towing's allegations sound in tort. *See, e.g.,* PGW's brief in support of its motion to dismiss at 15; *see also United*

*States v. Chem-Dyne Corp.,* 572 F.Supp. 802 (S.D.Ohio 1983).