The **CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF VIRGINIA, Plaintiff,**

v.

**PECK IRON & METAL CO., INC., et al., Defendants.**

C.A. No. 92–506.

United States District Court,
E.D. Virginia,
Richmond Division.

March 11, 1993.

---

Richard Kent Bennett, Shawn Renea Urelius Jordanger, Betty Sinclaire Wommack, McSweeney, Burtch & Crump, Richmond, VA, for plaintiff.

Channing Joseph Martin, William Rutherford Mauck, Jr., Brian Douglas Bertonneau, Williams, Mullen, Christian & Dobbins, Richmond, VA, and John F. Lyons, Richard E. Fox, Barrett & McNagny, Fort Wayne, IN, for defendants

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, Senior District Judge.

This matter is before the Court on cross-motions for summary judgment by and against plaintiff and the self-proclaimed indirect seller defendants in this case. While the relevant caselaw and this Court's previously entered Memorandum Opinion [1] make it fairly clear that "genuine" or "true" indirect sellers may be absolved of CERCLA liability, the evidence in this case shows that all except one of the self-labeled indirect sellers do *not* qualify as true indirect sellers. For the reasons set forth below, the Court enters judgment against those defendants which either sold directly to C & R Battery or who had sufficient knowledge, at the time of a sale to a battery broker, that the spent batteries being sold were destined for the C & R Battery site to constitute a "decision" on the part of the seller to send the batteries to C & R. The Court also enters judgment on behalf of the one genuine indirect seller defen-

---

1. *C & P Telephone Co. of Virginia v. Peck Iron & Metal Co.*, 814 F.Supp. 1269, 1274–76 (E.D.Va. 1992).

dant in this case—N.C. Salvage Co., Inc. ("N.C. Salvage")—which a) did not generate the batteries it sold, b) sold them to a "middleman" entity, not directly to C & R Battery and, most importantly, c) had no knowledge, actual or constructive, that the batteries would end up at the C & R site.

## I. *Procedural History*

On December 17, 1992, defendants Omni-Source Corporation ("OmniSource") and Berry Enterprises, Inc., t/a Berry Iron & Metal Co. ("Berry") moved for summary judgment on the issue of liability on the ground that they were merely indirect sellers of batteries which neither generated the used batteries they sold, nor made the crucial decision of how or where the batteries would be treated or disposed. The Court gave similarly situated defendants the opportunity to join this motion and file supporting memoranda. C & P, in mid-January of this year, filed its cross-motion for summary judgment, styled its "Third Motion for Partial Summary Judgment on Joint and Several Liability," against these indirect sellers.[2]

## II. *Background*[3]

The indirect seller defendants assert that they are not liable under CERCLA because they did not generate the spent lead-acid batteries that were treated and/or disposed of at the C & R site, never dealt with C & R Battery, and had no knowledge that their batteries would be disposed of at the C & R site.

The documentary evidence, however, clearly refutes the alleged indirect seller status of

all except one of these defendants. Some sold directly to C & R Battery.[4] Others, *on more than one occasion*, sold through a middleman from whom they received confirmatory documents indicating that their batteries had been consigned to C & R Battery Company in Richmond, Virginia. Had any of these defendants engaged in only one transaction with a middleman and received notice of the batteries' eventual shipment to C & R Battery only *after* that one transaction, the Court might be inclined to accord genuine indirect seller status to such parties. But once a defendant received notice from its go-between that its batteries ultimately had been sent to C & R Battery, it clearly was on notice, as far as any future transactions with that middleman were concerned, that its batteries could well wind up at the C & R site. Furthermore, some of these companies' self-generated documents demonstrate their knowledge that the batteries' ultimate destination was the C & R site.

Before addressing the legal merits of the indirect sellers' position regarding CERCLA liability, the Court will first, by culling through the documentary evidence, identify those parties against which liability should be imposed because they sold directly to C & R. Then, the Court will set forth the relevant framework for determining the liability of so-called indirect sellers. Afterwards, the Court will revisit the evidence against the remaining defendants and conclude, in all except one case, that they are not true indi-

---

**2.** There is not perfect overlap between those parties which joined OmniSource's and Berry's motion for summary judgment and those against whom C & P moved for summary judgment in its cross-motion. Specifically, Pocket Money Recycling ("Pocket Money"), New Castle Battery Mfg. Co. ("New Castle") and Bruce's Iron & Metal, Inc. ("Bruce's") joined the motion against C & P but were not named in the cross-motion. Instead, these three parties were among the 66 named by C & P in its second motion for partial summary judgment. Judgment already has been entered against Pocket Money. Today, judgment will be entered against New Castle on the basis of the rationale set forth in this Memorandum Opinion. The Court will continue to defer its decision on the liability of Bruce's until the record is more fully developed as to that defendant's alleged indirect seller status. Furthermore, C &

P has named Betty Fuller t/a S.S. Belcher ("Belcher") in its cross-motion although Belcher apparently did not formally join the indirect sellers' motion. Judgment will be entered against Belcher today, as well.

**3.** The factual background of this lawsuit is set forth in greater detail in the Court's Memorandum Opinion of December 24, 1992. *See C & P Telephone Co. of Virginia v. Peck Iron & Metal Co.*, 814 F.Supp. 1269 (E.D.Va.1992).

**4.** It may well be that some of the direct sellers also sold indirectly to C & R, but once a direct sale from a defendant to C & R can be established, consistent with the Court's previous rulings, joint and several liability must be imposed upon that party.

rect sellers, and cannot withstand C & P's motion for summary judgment.[5]

### III. Direct Sellers/Distributors

■ C & P contends that seven of the defendants which have claimed indirect seller status at one time or another sold directly to C & R. Uncontroverted documentary evidence confirms this contention vis-a-vis six of the defendants; the evidence linking one of the alleged direct sellers—Spartan Iron and Metal Corp. ("Spartan")—to a direct sale, however, is insufficient to justify entry of judgment against it at this time.

#### 1. Belcher

Receiving reports, C & R Battery statements and cancelled checks show that Belcher sold batteries directly to C & R on multiple occasions.

#### 2. Charles Bluestone Company, Inc. ("Bluestone")

In its response to plaintiff's requests for admissions, Bluestone concedes that "on two occasions it sold some whole lead acid batteries to C & R Battery" and "acted as a broker in one transaction between another company and C & R Battery." Three checks issued from C & R to Bluestone confirm their direct relationship.

#### 3. Exide Corporation ("Exide")

A direct relationship between C & R and Exide is established by a check payable to Exide from C & R dated October 16, 1980 and the unrefuted, corroborating affidavit of former C & R Battery President Charles Guyton, in which he testifies that the group of checks to which the Exide check belongs represents purchases of lead-acid batteries which were shipped to the C & R site. The memo portion of the check indicates that it was written for "batteries." Exide contends that it has investigated C & P's allegation of

direct sales and has been unable to confirm or deny the allegation. For the same reasons that the Court denied Exxon Corporation's cross-motion for summary judgment and entered judgment against it, the Court holds that Exide's argument is insufficient to survive C & P's summary judgment motion. Once again, evidence need not be overwhelming, but merely uncontroverted, to justify the imposition of liability.

#### 4. Niles Scrap Iron & Metal Co., Inc. ("Niles")

Two checks for "batteries" issued by C & R to Niles plus Guyton's affidavit statement that the group of checks to which these two belong represent C & R's purchase of batteries that were shipped to the site demonstrate direct sales between the two entities. Niles contends that it has conducted an exhaustive search of its business records and questioned the memories of its employees regarding transactions with C & R Battery, but all to no avail. Thus, it argues that, on the basis of the checks alone, summary judgment is not merited. The Court disagrees. Niles has not meaningfully challenged either the checks or the affidavit. The evidence mandates that summary judgment be entered against it; there has been no indication that postponing determination of this defendant's liability until trial will yield any new facts or evidence to overcome the documents before the Court at this time.

#### 5. Reserve Trading, Inc. ("Reserve Trading")

More than 10 of the defendants to this motion sold to C & R Battery through Reserve Trading. A bundle of invoices and statements indicate that Reserve Trading dealt directly with C & R Battery. The Court frankly is befuddled by Reserve Trading's contention that there are no documents

---

**5.** The Court's painstaking review of the documents submitted by C & P revealed that some of the documents were duplicates. The Court's summary of the evidence against each defendant set forth below accounts for this duplication; in other words, no duplicate documents have been counted twice against any defendant.

The Court specifically finds that the documentary evidence submitted in this case is more

trustworthy than the self-serving affidavits, submitted by particular defendants, recounting the memories of their officers and/or employees. The Court reserves the right, however, to revisit its imposition of liability against any defendant if it can demonstrate that the evidence presented against it and relied upon by the Court is not credible.

in the record which indicate transactions between Reserve Trading and C & R. Whether another entity such as C & R actually transported the batteries brokered by Reserve Trading to the C & R site is immaterial; it is clear that, on multiple occasions, Reserve Trading *made the decision* to ship batteries to the C & R site.

6. United Holdings Co., Inc. f/k/a United Iron & Metal Company, Inc. ("United")

A slew of cancelled checks for batteries evidence direct sales from United to C & R. United has not attempted to dispute the validity of these checks.

7. Spartan

A C & R Receiving Report dated May 6, 1982 (Bates No. T0133) shows the receipt by C & R of 41,440 pounds of batteries from Spartan. Spartan claims that this report does not represent a direct sale of batteries from Spartan to C & R. As can be seen on the receiving report, a name has been *scratched out and Spartan's name inserted.* Spartan contends that the crossed-out name is that of Metal Shippers, Inc., one of the other defendants in the lawsuit.[6] Spartan claims that on one occasion during the relevant time period, it sold batteries to Metal Shippers, but had no idea where the batteries would be taken by Metal Shippers. The affidavit of Spartan's president, Marvin Siegel, has been submitted in support of this allegation.

The Court is unprepared, solely on the basis of the scratched out name, to impose liability upon Spartan as a direct seller. Instead, it defers ruling upon this defendant's liability until its alleged indirect seller status is more fully developed in the record. This opinion sets forth in a detailed fashion the Court's approach to resolving indirect seller liability in this case. Hopefully, it will provide plaintiff and Spartan with meaningful guidance as to how exactly to supplement the record in this regard.

IV. *Analysis—Liability of True Indirect Sellers under CERCLA*

The indirect seller defendants contend generally that because 1) they were not generators of the used batteries and 2) they did not make the crucial decision of how the waste would be disposed or treated, they are not liable under CERCLA. These defendants contend that while courts have broadly construed the provisions of CERCLA, liability under the statute is not endless and does not attach to every transaction involving hazardous substances.

With one exception, C & P admits that the defendants were not generators of the batteries,[7] but disputes that this absolves them of CERCLA liability. C & P alleges that when these defendants sold spent batteries, they knew that the batteries had to be treated or disposed of, either by the immediate, or a subsequent, purchaser.

The Eastern District of Virginia already has set forth certain principles which guide this Court's determination of indirect seller liability under CERCLA. *See Allied Towing Corp. v. Great Eastern Petroleum Corp.,* 642 F.Supp. 1339, 1350 (E.D.Va.1986). In *Allied Towing,* the Philadelphia Gas Works ("PGW") sold an oil-based byproduct of its manufacturing process to Sealand Limited ("Sealand"). Sealand stored the liquid at a tank farm owned by Publicker Industries, Inc. ("Publicker"). When Sealand failed to pay rent on the storage of the liquid, Publicker exercised its warehouseman's lien, took possession of the liquid, and then sold the liquid to the Great Eastern Petroleum Corporation ("Great Eastern"). Great Eastern formed a joint venture with Petroferm USA, Inc. ("Petroferm") and they subsequently

---

6. Metal Shippers, Inc. was named in C & P's second motion for partial summary judgment on joint and several liability, and judgment was entered against it pursuant to the Court's March 8, 1993 Order and Memorandum Opinion, 1993 WL 117979.

7. The exception is Best Battery Company, Inc. ("Best Battery"), which C & P contends "is not a mere trader in batteries, but ... a manufacturer of batteries that generated significant quantities of spent batteries as part of its process." Best Battery has vigorously disputed this characterization. The Court assumes, solely for purposes of deciding this motion, that Best Battery is *not* a generator. The imposition of liability upon Best Battery is not dependent upon such a finding.

contracted to sell the liquid to Allied–Petroleum, Inc. ("API"). Allied Towing ("Allied") was contacted for transportation of the liquid to Norfolk. Upon arrival in Norfolk, API determined that the liquid was not as described in the contract and rejected the entire shipment. Allied was required to expend money to dispose of the liquid as a hazardous waste and brought an action against the above-mentioned parties to recover its costs.

Publicker filed a motion to dismiss the CERCLA claim. In granting the motion, the Court said:

> this Court finds persuasive the analysis used in *A & F Materials*.[8] Construing the "otherwise arranged" language of [CERCLA § 107(a)] subsection (3), the Court determined that "the relevant inquiry is *who decided* to place the waste in the hands of a particular facility that (now) contains the hazardous waste." In this case, Towing alleges that Great Eastern, and by implication perhaps Petroferm, determined where to place the substance.

642 F.Supp. at 1350 (citation omitted). Because Publicker did not generate the wastes and was not alleged to have participated in the *decision* to ship the wastes via Allied Towing's barge, Publicker was deemed not liable under CERCLA.

■ The Court already has endorsed this basic approach to determining CERCLA liability. In its Memorandum Opinion imposing liability on the defendants named in C & P's first motion for summary judgment, the Court stated, "the defendants [those named in C & P's first motion] *made the decision* to sell spent lead acid batteries to C & R Battery—a facility that contains lead. Thus, they arranged for the treatment and disposal of the lead, and fall well within the ambit of § 107(a)." *Peck Iron*, 814 F.Supp. at 1275–76. The Court is thus bound by Eastern District of Virginia precedent and the law of

this case to impose liability on those defendants which "made the decision" to send batteries to the C & R site.

## V. *Analytical Framework*

For purposes of adjudicating this motion, the Court has subdivided the self-proclaimed indirect seller defendants into five basic categories. The composition of each subset is set forth below. The analysis of each group's liability follows.

### A. *Direct Sellers*

These are the defendants, listed and discussed above, as to which there is uncontroverted evidence establishing direct dealings with C & R. The Court already has stated its intention to impose joint and several liability upon each of these defendants except Spartan.

### B. *Sellers Whose Own Documents Demonstrate Knowledge of Shipment to C & R Battery*

■ These are defendants which sold batteries to C & R either through Reserve Trading or Midwest Corporation ("Midwest"), but whose own document(s) indicate their knowledge that the batteries they sold to the brokers were ultimately destined for the C & R site. They are:

1. Annaco, Inc. f/k/a Annandale Scrap Co., Inc. ("Annaco")

Two Reserve Trading sales contracts, three Reserve Trading bills of lading and *one of Annaco's own invoices* (Bates no. 500240) show that Annaco knew its batteries had been consigned to C & R Battery.

2. Metallics Recycling Co. ("Metallics")

Two Reserve Trading sales contracts, three Reserve Trading bills of lading and *one of Metallics' own invoices* (Bates no. 500122)

---

8. The court was making reference to *United States v. A & F Materials Co.*, 582 F.Supp. 842 (S.D.Ill.1984), in which the court held:

the relevant inquiry is *who decided* to place the waste into the hands of a particular facility that contains hazardous wastes.... [L]iability for releases under [CERCLA] is not endless; it ends with the party who both owned the hazardous waste and made the crucial decision how it would be disposed of or treated, and by whom.

582 F.Supp. at 845 (emphasis in original).

show that Metallics knew its batteries had been consigned to C & R Battery.

### 3. Mine Battery Service, Inc. ("Mine Battery")

*Two of Mine Battery's own documents*—a bill of lading and service report (Bates nos. MBS 0000031, MBS 0000032)—show that Mine Battery knew its batteries had been consigned to C & R Battery.

### 4. OmniSource

Three Reserve Trading sales contracts, five Reserve Trading bills of lading, *three of OmniSource's own invoices* (Bates nos. 500185, 500351, 500363), and *four of OmniSource's own sales contracts* (Bates nos. 500190, 500264, 050453, 050457) show that OmniSource knew its batteries had been consigned to C & R Battery.

### 5. Reserve Iron & Metal Limited Partnership ("Reserve Iron")

One Reserve Trading sales contract, one Reserve Trading bill of lading, *one of Reserve Iron's own shipping tickets* (Bates no. 500305 [bottom half]), and *one of Reserve Iron's own invoices* (Bates no. 500305 [top half]) show that Reserve Iron knew its batteries had been consigned to C & R Battery.

### C. Sellers Which Received Multiple Confirmatory Documents Indicating that Their Batteries Ultimately Were Shipped to C & R Battery

■ These are defendants which sold through Reserve Trading and received confirmatory documents after those sales indicating that their batteries had been consigned to C & R. Importantly, all of these defendants engaged in more than one transaction with Reserve Trading. Thus, when the defendant entered into an arrangement for battery disposal with Reserve Trading for the *second* time, it had constructive knowledge that, on at least one previous occasion, the batteries it sold to Reserve Trading had been shipped to C & R Battery. They are:

### 1. All–Scrap Salvage, Inc. ("All–Scrap")

Reserve Trading sent two sales contracts and two bills of lading to All–Scrap stating that its batteries had been consigned to C & R Battery.

### 2. Arcon Equipment, Inc. ("Arcon")

Reserve Trading sent two sales contracts and three bills of lading to Arcon stating that its batteries had been consigned to C & R Battery.

### 3. Lake City Scrap Metal, Inc. ("Lake City")

Reserve Trading sent two sales contracts and two bills of lading to Lake City stating that its batteries had been consigned to C & R Battery.

### 4. The National Waste Paper Co. ("National Waste Paper")

Reserve Trading sent one sales contract and two bills of lading to National Waste Paper stating that its batteries had been consigned to C & R Battery.

### 5. New Castle

Reserve Trading sent two sales contracts and two bills of lading to New Castle stating that its batteries had been consigned to C & R Battery.

### 6. St. Mary's Iron & Steel Corporation ("St. Mary's")

Reserve Trading sent two sales contracts to St. Mary's stating that its batteries had been consigned to C & R Battery.

### 7. Willoughby Iron & Waste Material Company ("Willoughby")

Reserve Trading sent two sales contracts and two bills of lading to Willoughby stating that its batteries had been consigned to C & R Battery.

### D. Sellers with Knowledge of C & R Shipping

■ These are defendants who sold through middlemen but who were aware that C & R Battery trailers came to their sites to

pick up and transport the batteries. They are:

### 1. Berry

Berry is connected to the C & R Battery site by virtue of sales through Integrated Metals, Inc. Two of Berry's shipping tickets (Bates nos. 100001, 100002) show that Berry knew that batteries it sold to Integrated Metals were picked up by a C & R Battery Co. trailer. Both documents bear the notation: "Del: C & R Battery Co. Trailer."

### 2. Best Battery

Best Battery sold through defendant Irving Hurwitz. Basically, Hurwitz was a peddler who collected and sold batteries to Best Battery for a number of years. In 1982, he began buying trailer loads of batteries and reselling them to battery breakers such as C & R Battery. The purchaser from Mr. Hurwitz would provide the transportation.

Excerpts from Hurwitz's deposition demonstrate Best Battery's knowledge that the batteries it sold to Hurwitz were being sent to, or at a minimum, picked up by, C & R Battery:

Q. [D]id you have any discussions with Best Battery Company officials as to where you were selling the batteries?

A. Yes, they knew where the batteries were being sold.

Q. How would they know that?

A. Because the trucks would go directly to Best Battery warehouse to pick up the batteries that were on their pallets, and Best Battery's men with the forklift would go to the trailers. And sometimes Rollie Best [9] used to come back on the platform there and watch the operation, the truck being loaded, and at times spoke to the driver. And C & R trucks has their lettering on the side. I mean, you had to know where the batteries were going.

Hurwitz Dep. at 11.[10]

### E. *True Indirect Sellers*

■ There is only one defendant—N.C. Salvage—which sold its batteries to an entity other than C & R Battery with no knowledge at all that C & R Battery would become involved in the transaction in any fashion. C & P concedes that its document search "has not revealed any documents which show that N.C. Salvage knew that its batteries were delivered to the C & R Battery Site."

### F. *Liability*

With the exception of N.C. Salvage, every one of the defendants to this motion "made the decision" to send batteries to the C & R Battery site. While the liability of some parties is clearer than others, the Court holds without hesitation that these defendants' knowledge, actual or constructive, of their batteries' ultimate destination merits the imposition of liability against them.

The case against defendants whose *own* documents demonstrate knowledge that their batteries were headed for C & R is easily resolved. These parties cannot credibly claim that they were not notified by their broker of the batteries' destination, for their own self-generated documents definitively negate such a contention. These are not cases of constructive, but actual, knowledge. These defendants knew, at the time of sale, that their batteries had been consigned to C & R. There is no question that they *made the decision* to send their batteries there. The Court will not absolve them of liability just because another party helped facilitate the transaction.

The Court considers the liability of the remaining defendants—those who received multiple confirmatory documents indicating consignment to C & R Battery and those who were aware that C & R Battery trucks

---

9. This appears to be a reference to Roland Couet Best, president of Best Battery.

10. The affidavit of Best Battery's president stating that Hurwitz never disclosed where he was reselling the batteries is of no moment. The Court is not requiring such actual knowledge pre-sale. Its holding is premised on the fact that C & R trailers repeatedly visited the Best Battery warehouse to pick up batteries. This fact is fully supported by the Hurwitz deposition, and remains uncontroverted.

were shipping their batteries—to be essentially co-extensive. These defendants urge the Court to adopt the untenable position that they should be rewarded for conducting business in a blindfolded fashion. Purposeful ignorance cannot act as a shield to CERCLA liability. All of these defendants were in possession of information which alerted, or should have alerted, them to the fact that the brokers with whom they were doing business had consigned their batteries to C & R Battery. Their continued sale of batteries to these entities, *after obtaining this knowledge*, amounts to a decision on their part to send batteries to C & R.

There is a compelling argument that an entity that sells to a middleman, like Reserve Trading, and deliberately pays no attention whatsoever to the batteries' ultimate destination *makes the decision* to send the batteries wherever they wind up. The Court does not adopt that position in this case, however, to avoid casting CERCLA's net too wide. But the Court's imposition of liability upon those defendants with actual or constructive knowledge that their batteries would end up at the C & R site does not impose the onerous burden suggested by the defendants. Under the Court's holding, not everyone in the "chain" of disposal is held liable, only those which made the practical decision to deal with a specific and known entity—in this case, C & R Battery.[11]

All of the defendants, except N.C. Salvage, possessed information which notified them of C & R Battery's involvement with their batteries. They continued to do business with the same entities which brought *C & R* into the picture, however, and cannot now come into court and claim that they were dumbfounded when their batteries wound up at the C & R site. Whether employees or officers of the defendants actually remember anything about C & R Battery is immaterial; once they came into possession of the infor-

mation recited above, they gained constructive knowledge of the consignment arrangement with C & R Battery.[12]

This is the only plausible result the Court can reach. A holding to the contrary would actually encourage sellers of hazardous waste to transact business in an irresponsible fashion. A defendant which acknowledged on its own forms that its batteries had been consigned to C & R Battery is no more culpable than a defendant which participated in an identical transaction but either chose not to read the mail when it was sent confirmatory documents or purposefully turned the other cheek to its product's final destination. CERCLA liability cannot possibly turn on a seller's ability to convince the buyer of its waste not to tell it where the waste is being sent. These defendants are not genuine indirect sellers; they are entities that did business on multiple occasions with brokers whom they knew had in the past consigned their batteries to C & R Battery. Thus, they *made the decision* to send their batteries to C & R. Liability will be imposed against them.

The Court will grant N.C. Salvage's cross-motion for summary judgment simply because no evidence has been adduced to prove that it had knowledge, either constructive or actual, that C & R Battery ever came in contact with its batteries. Without a shred of such evidence, the Court cannot hold, consistent with its prior rulings, that N.C. Salvage *made the decision* to send its batteries to C & R Battery.

### VI. *Conclusion*

For the reasons articulated above, the Court enters judgment for joint and several liability on behalf of C & P against all of the defendants named in its third motion for partial summary judgment with the exception of Spartan and N.C. Salvage. The

---

11. Certainly, a driver who brings a spent automobile battery into a service station for disposal does not receive advance notification of that battery's ultimate destination. Even in the unlikely event that she receives such information by way of a confirmatory receipt or document, CERCLA liability would not attach to that driver under the Court's ruling until the driver came to the same service station on a second occasion and deposit-

ed another spent automobile battery there for disposal. Thus, the defendants' analogy presented at oral argument misses the mark.

12. The Court already has held that the imposition of liability against a defendant is not contingent upon its blessing of the evidence submitted against it.

Court grants N.C. Salvage's cross-motion for summary judgment, and defers ruling on Spartan's liability until the record has been more fully developed as to that defendant. Additionally, the Court enters judgment against New Castle, which was named in C & P's second summary judgment motion, but as to which a decision was postponed until today, and further defers ruling on defendant Bruce's liability until such time as its alleged indirect seller status can be more fully explored in the record.