**UNITED STATES of America, Plaintiff,**

v.

**NORTH LANDING LINE CONSTRUCTION COMPANY, et. al., Defendants.**

No. Civ. 2:96CV1073.

United States District Court,
E.D. Virginia,
Norfolk Division.

April 20, 1998.

Helen F. Fahey, Esq., U.S. Attorney's Office, Alexandria, VA, Craig P. Wittman, Office of the U.S. Attorney, Norfolk, VA, Nathaniel Douglas, Lois J. Schiffer, Walker B. Smith, U.S. Department of Justice, Environmental Enforcement Section, Washington, DC, Rodney Travis Carter, Office of Regional Counsel, Philadelphia, PA, for Plaintiff.

David Allen Hearne, Grover C. Outland, Jr., Outland, Gray, O'Keefe & Hubbard, Chesapeake, VA, for Defendants.

### ORDER and OPINION

MORGAN, District Judge.

In this CERCLA[1] case, the United States sought to recover from defendant North Landing Line Construction Company ("North Landing") response costs incurred by the United States in response to the release or threatened release of hazardous waste at the Sutton Enterprise Superfund Site ("the Sutton Site") in Chesapeake, Virginia. At the conclusion of the liability portion of a bench trial on February 19, 1998, the Court **GRANTED** the defendant's motion for a directed verdict as to liability. This opin-

---

1. Comprehensive Environmental Response, Compensation and Liability Act of 1980, § 101 et seq., 42 U.S.C. § 9601 et seq.

ion sets forth in more detail the reasoning behind the Court's ruling.

## I. Factual and Procedural Background

From 1979 until 1990, Sutton Enterprises ("Sutton") operated a junkyard and/or salvaging business at the Sutton Site. The Sutton Site consisted of four acres of land, believed to be Tax Parcels 29, 29–A, 135, 136 and 137, at or near 1607–A Alexander Lane in Chesapeake, Virginia. Used electrical transformers, which contained PCB's, were among the items salvaged during the relevant time period. The vast majority of the hazardous waste disposed at the site was generated by the federal government, with the remainder generated by Newport News Shipbuilding.

In January of 1990, the Chesapeake Fire Marshal's office received a complaint about the Sutton Site and conducted an investigation. The investigators determined that PCB's had contaminated the ground at the Sutton Site. Local authorities then requested assistance from the Environmental Protection Agency ("EPA") in responding to conditions at the Sutton Site. The EPA dispatched a cleanup team to the Sutton Site and commenced cleanup operations, completing the cleanup on June 17, 1991.[2]

On November 10, 1987, the United States Department of the Navy contracted with North Landing to upgrade the electrical system at the Little Creek Amphibious Base ("Little Creek"). North Landing installed new transformers, resulting in the removal of a number of PCB containing transformers. North Landing contracted with Aptus Environmental Services to remove the 40 transformers with PCB concentrations above 50 parts per million ("ppm") and paid them $10,000 for that removal. North Landing contracted with Ray Cohen to remove the transformers with lower PCB concentrations. After retrieving the transformers from Little Creek, Cohen contacted Sutton Enterprises about the transformers, and Sutton Enterprises removed the transformers to the Sutton Site where copper and other metals contained in the transformers were recycled, a reclamation project which would net Sutton $75–$2,000 per transformer.

## II. Summary of Findings of Fact

### A. Undisputed Facts Stipulated by the Parties

1. Sutton Enterprises is a scrap/junk yard business, located at or near 1067–A Alexander Lane, Chesapeake, Virginia.

2. Sutton Enterprise's business included the purchase of scrap metal, used equipment and other materials considered to be junk or scrap material. The materials purchased by Sutton or sold to Sutton included transformers, some of which contained polychlorinated biphenyls ("PCBs"). All of the materials purchased by Sutton were considered to be scrap or junk, including the transformers.

3. With respect to transformers, Sutton's business operations involved salvaging, dismantling or breaking apart the transformers for the purpose of reclaiming metals in them, such as copper. The reclaimed metals were sold to companies, such as Money Point Diamond Corporation t/a Jacobson Metal Company.

4. Raymond Cohen died in or about 1993.

5. In late October or early November of 1989, North Landing Line was performing an electrical contract for the United States Government at the Little Creek Naval Amphibious Base designated as N62470–87–C–5235 ("NAB Contract").

6. Mr. Ron Neighbors, North Landing's president, directed Mr. Oakes, North Landing's vice-president, to prepare a Memorandum of Sale for the transformers from the NAB Contract to Mr. Cohen.

---

2. The United States Navy and the United States Defense Reutilization and Marketing Service have already admitted that they are liable for response costs as "arrangers for disposal." See 42 U.S.C. § 9607(a)(3). In addition, the other defendants, except for North Landing, have agreed to settle. See Proposed Consent Decree.

If the Proposed Consent Decree is approved, the federal entities involved will pay 82% of the response costs, approximately $1.6 million. Defendant Jacobsen will pay $50,000 and defendant FFA, an owner of a small portion of the Site, will pay $25,000 to settle this lawsuit.

## B. Disputed Facts

In summary, the Court makes the following conclusions with respect to significant aspects of the findings of fact:

1. A release of hazardous substances, PCBs, occurred at a facility, the Sutton Site, for which the government incurred response costs.

2. The United States contracted with North Landing for the upgrade of the electrical distribution system at Little Creek, including removal of certain PCB containing transformers.

3. The United States specified in the contract with North Landing that "[t]ransformers which contain less than 5 ppm of PCB shall be disposed of off base at the Contractor's expense." Exhibit 4 ¶ 2.2. In a letter to Ray Cohen, North Landing's vice-president instructed Cohen to "dispose of [the transformers] as you see fit." Exhibit 14. While the government attempted to argue at trial that North Landing should be held liable as an "arranger for disposal" under CERCLA because it had used the term "dispose of" in its letter, Neighbors testified that he instructed his employees to use terminology in correspondence that mirrored terminology used in the government contract.

CERCLA does not contain a definition of "disposal." Instead, CERCLA borrows a definition of "disposal" from the Resource Conservation and Recovery Act. *See* 42 U.S.C. § 9601(29); *Nurad, Inc. v. Hooper & Sons, Co.*, 966 F.2d 837, 845 (4th Cir.1992). That definition states:

> the term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into the water, including ground water.

42 U.S.C. § 6903(3).

■ The term "dispose of" as used in the NAB Contract and the Oakes letter cannot be defined using the RCRA definition of "disposal." If it were, then the Navy would have required North Landing, by contract, to violate CERCLA by discharging hazardous waste onto land, an irrational result. *See* 42 U.S.C. § 6903(3).

■ Thus, the Court must ascertain what meaning Oakes, North Landing's vice-president, attempted to convey when he used the term "dispose of" in his letter to Cohen. Neighbors testified that he instructed his subordinates, including Oakes, to use government contractual terms in correspondence concerning those contracts in order to maintain consistency. The Court notes that no party cited a definition for "dispose of" in its proposed findings of fact, and the attorneys for the government took a considerable amount of time to locate the term in a corollary statute, the RCRA, when the Court requested a CERCLA definition of the term. If the attorneys for the government cannot readily define "disposal" as it is used in CERCLA, a layman cannot be expected to have intended that meaning in the subject letter. Thus, the term "dispose of" as used in the letter will be given its ordinary dictionary meaning.

Webster's Third International Dictionary defines the term "dispose of," as used in the Oakes letter, as follows: "2a: to transfer into new hands or to the control of someone else (as by selling or bargaining away) ... b(1) to get rid of." Therefore, the Court finds that North Landing, by using the term "dispose of" in its letter, wanted Cohen to sell or get rid of the transformers, not discharge the potentially hazardous PCBs as the RCRA definition of "dispose of" would suggest.

4. The original contract required North Landing to remove transformers with PCB concentration levels of 50 ppm and above to a facility with a PCB disposal exemption and those with less than 5 ppm off-base at North Landing's expense. The Navy estimated, for bidding purposes, that 20% of the transformers contained PCBs; in fact, 134 transformers contained 5ppm or less and 79 contained PCBs in concentrations of greater than 5 ppm. Since the contract estimate was for the removal of 42, not 79, transformers, North Landing submitted a change order seeking $30,000 more to remove those transformers. The Navy issued a no-cost change

**698**

order that changed the PCB level requiring off-base disposal from 5 ppm to 50 ppm, which had the effect of making North Landing dispose of many more transformers at its own expense. North Landing contested the change, but the Navy issued a Unilateral Modification on February 1, 1989. The Navy notified North Landing of its appeal rights under the contract's dispute clause, but North Landing did not appeal.

■ With respect to the contractual change from 5 ppm and below transformers for which North Landing was responsible to 50 ppm and below transformers for which North Landing was responsible, the Court finds that the change is an ambiguity in the contract which must be construed against the drafter, the United States. If the government had intended to substitute 5 ppm for 50 ppm throughout the contract, it could have easily done so, instead of changing such designation in one place and not in the others.

5. The only evidence regarding the condition of the PCB containing transformers when removed from Little Creek comes from the testimony of Ron Neighbors, president of North Landing. While attorneys for the government described the transformers as "a pile of junk," the defendant's president testified, when called by the government as an adverse witness, that a number of the transformers were almost new and were in working condition to be reused as transformers, not as scrap metal. The transformers were not leaking PCB fluid at the time they were removed from Little Creek. The transformers were removed only because Little Creek was upgrading its electrical system and required transformers that could handle a higher voltage load, not because the removed transformers were inoperable.

6. North Landing, seeking a means to remove the transformers from Little Creek, contracted with Raymond Cohen for such removal. North Landing instructed Cohen to "dispose of [the transformers] as you see fit." *See* Exhibit 14, Letter from Robert S. Oakes to Raymond Cohen.

7. Raymond Cohen was acting as an independent entity when he contracted with North Landing to remove transformers from Little Creek. He was not an employee of Jacobsen Metals, Sutton Enterprises or North Landing at the time that he removed the transformers from Little Creek.

8. North Landing agreed to pay Cohen the nominal sum of $1.00 to remove the transformers.

9. North Landing had no knowledge, actual or constructive, that the transformers were taken to the Sutton Site after removal from Little Creek. Cohen told North Landing's representatives that he would resell the operable transformers to distribute electricity for the North Carolina Rural Electrification Operatives. Cohen then informed William Sutton, without North Landing's knowledge, that he could remove the transformers from Little Creek. Sutton contracted with L & L Trucking, an independent contractor, to pick up the transformers and deliver them to the Sutton Site, without North Landing's knowledge.

10. There is no evidence that North Landing had ever dealt with Sutton Enterprises or even knew of Sutton Enterprises' existence before the filing of this lawsuit.

11. There is no evidence that North Landing had ever disposed of transformers in a similar manner. In the past, North Landing typically removed a few transformers from a worksite, drained the PCB oil out of the transformers using environmentally safe practices and sold the drained transformers for scrap.

12. North Landing had never handled this large a quantity of transformers and did not have the capacity to drain and scrap this many transformers. North Landing's agreement to sell the transformers to Raymond Cohen was the only transaction between the two.

13. North Landing compiled detailed documentation of the serial numbers and PCB levels of each transformer and gave that information to Raymond Cohen. Given North Landing's thorough documentation, the Court finds that North Landing had no intent to dispose of the transformers illegally or in an unsafe manner when it released them to Raymond Cohen.

14. The Court finds that there is no evidence of privity between the defendant or its agents and Sutton Enterprises or the Sutton Site.

## III. Conclusions of Law

### A. Legal Background

 CERCLA authorizes suits for contribution and indemnification costs against:

(1) the owners and operators of a facility at which a release or threatened release of hazardous substances exists; (2) the owners or operators of such a facility at any time in the past when hazardous substances were disposed of; (3) any person or entity who "arranged for" the treatment and disposal of a hazardous substance at the facility; and (4) any persons who transported hazardous substances to the facility.

*United States v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373, 1377 (8th Cir. 1989); *see* 42 U.S.C. § 9607(a). The only issue before the Court is whether North Landing "arranged for disposal" of the transformers within the meaning of CERCLA. "Arranger" liability attaches to:

3. Any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another person or entity and containing hazardous substances.

42 U.S.C. § 9607(a)(3). Courts interpreting this provision must interpret it broadly to advance the primary goals of CERCLA which are (1) providing the federal government with tools to effectively respond to hazardous waste problems and (2) ensuring that those responsible for the problems bear the costs of hazardous waste cleanup. *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1112 (D.Minn.1982).

The United States must prove the following elements to establish defendant North Landing's liability: (1) there was a "release" of a hazardous substance; (2) from a "facility"; (3) which caused the United States to incur response costs; and (4) defendant North Landing "arranged for disposal" of the hazardous substances.[3] *See* 42 U.S.C. § 9607(a)(3). While the Fourth Circuit Court of Appeals has not definitively interpreted the phrase, District Courts in this Circuit have taken three primary views as to how the term "arranged for disposal" can be interpreted. The Court will address each approach.

### B. The Three Approaches to Interpretation of the term "Arranged For Disposal"

#### 1. The *Peck Iron* "knew or should have known" approach

This Court has previously considered whether indirect sellers could be held liable for the ultimate disposal of a hazardous substance. *See Chesapeake & Potomac Telephone Co. v. Peck Iron & Metal Co., Inc.*, 814 F.Supp. 1293 (E.D.Va.1993). There, several lead-acid battery middlemen contended that they could not be held liable under CERCLA because they did not generate the used batteries and did not make a decision as to how the batteries would be disposed of, the same arguments that North Landing makes. *Id.* at 1295. The Court examined a 1986 decision, *Allied Towing Corp. v. Great Eastern Petroleum Corp.*, 642 F.Supp. 1339, 1350 (E.D.Va.1986), and decided that it was "bound by Eastern District of Virginia precedent and the law of this case to impose liability on those defendants which 'made the decision' to send batteries to the C & R site." *Id.* at 1298. The Court further clarified its position, emphasizing that "not everyone in the 'chain' of disposal is held liable only those which made the practical decision to deal with a specific and known entity." *Id.* at 1301.

The Court went on to impose liability against defendants who had actual or con-

---

3. Before trial, the parties stipulated that factors (1) and (2) had been satisfied. Although North Landing did not stipulate that the government incurred response costs, factor (3), the United States proved, by a preponderance of the evidence, that it incurred response costs.

structive knowledge that their batteries were being sent to the offending battery disposal site. *Id.* at 1300. The Court held liable only those defendants who had received memoranda indicating battery consignment to the offending site but claimed that they did not know of the ultimate destination, finding that "[p]urposeful ignorance cannot act as a shield to CERCLA liability." *Id.* at 1301. The Court found that "[t]hese defendants are not genuine indirect sellers; they are entities that did business on multiple occasions with brokers whom they knew had in the past consigned their batteries to [the ultimate disposition site]." *Id.* Of note, however, the Court refused to impose liability against a defendant, an indirect seller, who had neither actual nor constructive knowledge. *Id. See Gould, Inc. v. A & M Battery and Tire Service,* 954 F.Supp. 1014, 1017 (M.D.Pa. 1997) (citing the *Peck Iron* approach approvingly).

In *Allied Towing,* the case cited by the *Peck Iron* Court, this Court considered whether a company which exercised its warehouseman's lien and sold 1,000,000 gallons of a hazardous material to another corporation for $1.00 could be held liable under CERCLA as a company that had "arranged for" the disposal of hazardous waste. 642 F.Supp. at 1342. This Court cited approvingly the decision in *United States v. A & F Materials Co.,* 582 F.Supp. 842 (S.D.Ill.1984) and concluded that "the relevant inquiry [for determining 'arranged for' liability] is who decided to place the waste into the hands of a particular facility that (now) contains the hazardous waste." *Id.* at 1350 (quoting *A & F Materials Co.,* 582 F.Supp. at 845).

### 2. The Eleventh Circuit "totality of the circumstances" approach

In *South Florida Water Management District v. Montalvo,* 84 F.3d 402 (11th Cir. 1996), the Eleventh Circuit adopted the "totality of the circumstances" approach to interpreting the term "arranged for." The Court there "rejected any attempt to substi-

tute a per se rule for the phrase 'arranged for,'" instead finding that "courts must focus on all of the facts in a particular case.... While factors such as a party's knowledge (or lack thereof) of the disposal, ownership of the hazardous substances, and intent are relevant to determining whether there has been an arrangement for disposal, they are not necessarily determinative of liability in every case." *Id.* at 407.

A District Court in the Northern District of West Virginia recently adopted the "totality of the circumstances" approach after examining the various judicial methods of interpreting the term "arranged for." *See United States v. Gordon Stafford, Inc.,* 952 F.Supp. 337 (N.D.W.Va.1997). There, the Court imposed liability on a middleman who had purchased PCB laced transformers for resale, discovered that they were leaking PCB oil and then contracted with a disposal service to haul them away. *Id.* at 338. The Court found that the middleman had actively engaged in attempts to dispose of the PCB laced transformers by any means possible. *Id.* at 341.[4]

### 3. The *Ward* approach

In *United States v. Ward,* 618 F.Supp. 884 (E.D.N.C.1985), the district court rejected the defendants' argument that their agreement to dispose of PCB laced transformers was a "sale" of the transformers instead of a "contract" arranging for disposal. The disposer had contracted to pay $1.70 per transformer removed to a party that owed him a personal debt. *Id.* at 895. The court held that the disposal was not a sale, but rather a service that the disposer was performing. Broadly construing the term "arranged for disposal," the *Ward* Court held that knowledge of the eventual disposal site was not a requirement for holding an "arranger" liable because "to give the statute [that] interpretation ... would encourage ... blatant disregard for the consequences of hazardous waste disposal." *Id.*[5]

---

4. The *Gordon Stafford* defendants would have probably been found liable under the *Peck Iron* approach as well because they knew that the disposal was to occur on an illegal private site.

5. The Court notes that the approach to "arranger"/indirect seller liability taken by the *Ward* Court stems primarily from the egregious facts of that case. In *Ward,* the defendant disposed of the PCB's by riding down deserted country high-

## C. Analysis

██ In the absence of Fourth Circuit precedent, the Court will follow precedent from its own district and adopt the *Peck Iron* approach to construing the term "arranged for disposal," an approach which produces an outcome consistent with the text of the statute. Integrating the applicable RCRA definition of "dispose of," CERCLA imposes liability on a party which arranges for the discharge of hazardous waste on certain land. Under the *Peck Iron* approach, the government has burden of proving that North Landing made the crucial decision to send the PCB containing transformers to the Sutton Site.

██ The only evidence before the Court regarding North Landing's knowledge of the transformer disposal is that Raymond Cohen informed North Landing that he had found a buyer who would use the transformers for their normal business purpose, to supply electricity. The government introduced no evidence that North Landing knew or should have known that the transformers would ultimately arrive at the Sutton Site. Instead, the government asks the Court to find that by allowing Cohen to remove the transformers for resale, North Landing "arranged for disposal." Even interpreting the term "arranged for disposal" liberally, as this Court must, the Court cannot find that North Landing was required to investigate beyond Cohen's representation that the transformers would be resold for their intended use. An innocent middleman cannot be expected to foresee where hazardous wastes will ultimately come to rest. As the Second Circuit has noted, "[a]lmost all courts that have held defendants liable as arrangers have found that the defendant had some actual involvement in the decision to dispose of waste." *General Electric Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir.1992). Under the government's argument, CERCLA would impose almost unlimited liability, making any entity through whose hands hazardous wastes passed liable under CERCLA.

The Court does not believe that CERCLA's drafters intended such unlimited liability.

In *Peck Iron*, this Court recognized the potential problem of "purposeful ignorance" and noted that any indication at all, including conversations, memoranda or receipts, that give an indirect seller notice that its products might go to a certain disposal site are sufficient to make the seller liable. *See* 814 F.Supp. at 1300–01. In this case, the government has shown no such "purposeful ignorance" on the part of North Landing. The government has introduced no receipts, memoranda, witnesses or documentation from which North Landing should have known that Cohen would transfer the transformers to the Sutton Site. Thus, the potential problem of "purposeful ignorance" is nonexistent in this case.

The government argues that the indirect seller approach from *Peck Iron* is inapplicable to this case because North Landing paid Cohen $1.00 to remove the transformers; thus, North Landing was not an indirect seller because it paid someone to take the transformers. While North Landing may not be an indirect seller, the Court notes that the *Allied Towing* Court found the crucial decision to place waste at a particular site, not payment for hazardous waste, the deciding factor in establishing arranger liability. *See* 642 F.Supp. at 1350. In *Allied Towing*, the "indirect seller" received only a nominal amount, $1.00 for 1,000,000 gallons of the hazardous waste, and the Court never mentioned "indirect seller" status as a criterion for escaping CERCLA liability. *See id.* at 1342.

Thus, the Court **FINDS** that the *Peck Iron / Allied Towing* "crucial decision" approach should be applied and that the government has failed to prove, by a preponderance of the evidence, that North Landing made the crucial decision to deposit the transformers at the Sutton Site. *See Peck Iron*, 814 F.Supp. at 1298; *Allied Towing*, 642 F.Supp. at 1350. Accordingly, North Landing is not liable for response costs as a party who "arranged for disposal" of hazardous wastes.

ways and spraying the PCB's out of a tanker truck. Moreover, neither party in this case re-

quests that the *Ward* approach be utilized.

■ The government argues that the "totality of the circumstances test" is the best approach to use in determining arranger liability under CERCLA. Even if this Court were to apply the "totality of the circumstances" test, North Landing would not be liable as an arranger. Under the "totality of the circumstances" test, a court must consider all of the circumstances surrounding a transaction, including (1) intent, (2) knowledge and (3) ownership. *See Montalvo,* 84 F.3d at 407.

Of these three primary factors, only ownership may potentially weigh in favor of the government. North Landing could be found to own the transformers or be mere bailees of same, since they could dispose of the transformers in whatever fashion they might wish. Although ownership is an element to consider under the totality of the circumstances approach, the applicable statute does not mention ownership and that requirement cannot be easily distilled from the face of the statute. *See* 42 U.S.C. § 9607(a)(3). Ownership is merely a judicially created test factor that has little practical significance.

The other two factors, which are significant under the totality of the circumstances test, weigh heavily in favor of North Landing. The Court finds that North Landing did not intend to dispose of the transformers at the Sutton Site or to dispose of the transformers in any illegal manner. In examining North Landing's intent, the Court finds the documentation given to Raymond Cohen by North Landing persuasive evidence that North Landing did not intend to dispose of the transformers in an unsafe or illegal manner. Neighbors testified that North Landing provided Cohen with an itemized list of the serial numbers and corresponding PCB levels of each transformer upon the belief that the transformers would reach the North Carolina electric cooperatives and that those cooperatives would use the transformers to provide electricity to consumers, not to recycle them for scrap metals. *See* Exhibit 11, PCB Analysis. If North Landing's intention was simply to dump the transformers at a salvage yard without concern for environmental repercussions, the Court does not believe that North Landing would have test-

ed each transformer and created a paper trail of each transformer's PCB level. The most reasonable inference to be drawn from the extensive documentation is that North Landing had no intention to send the transformers to the Sutton Site and attached the documentation so that whoever received the transformers would use them in a lawful manner.

With respect to the knowledge factor of the totality of the circumstances test, the Court has previously noted its finding that North Landing had no actual or constructive knowledge that the transformers would be disposed of at the Sutton Site or disposed of in any environmentally harmful manner. Thus, this factor weighs squarely in favor of North Landing.

When questioned by the Court, the government presented no factors other than ownership, intent and knowledge that the Court should consider in determining whether North Landing should be held liable under the totality of the circumstances test. Thus, even if the Court had applied the test that the government advocates the Court would have found that North Landing was not liable for response costs under § 9607(a)(3).

### CONCLUSION

For the reasons stated above, the Court **GRANTS** the defendant's motion for a directed verdict as to its liability for response costs under § 9607(a)(3). Accordingly, the defendant is **DISMISSED** as a defendant in this lawsuit.

The Clerk is **REQUESTED** to mail a copy of this Order to all counsel of record.

It is so **ORDERED**.